## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GREGORY ALTENBACH,         :
        Plaintiff,         :     Civil Action No. 3:14-cv-1932
                     :
         v.              :     (Judge Mariani)
                     :
TONI IANUZZI, et al.,        :
        Defendants.      :

FILED
SCRANTON

SEP 2 5 2015

PER_____
DEPUTY CLERK

### MEMORANDUM

Plaintiff, Gregory Altenbach, an inmate currently confined at the Camp Hill State Correctional Institution initiated the instant civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 1).[1] The complaint sets forth constitutional violations for events that occurred at the State Correctional Institution at Mahanoy, in Frackville, Pennsylvania ("SCI-Mahanoy"), and the State Correctional Institution at Benner Township, in Bellefonte, Pennsylvania ("SCI-Benner Township"). (Id.). Named as Defendants are Toni Ianuzzi, a nurse practitioner at SCI-Mahanoy; John Lisiak, a physician at SCI-Mahanoy; Jose Boggio, a physician at SCI-Mahanoy; Nicholle Boguslaw, a physician assistant at SCI-Mahanoy; Andrew Dancha, a physician at SCI-Benner Township; Maria Leahy, a physician assistant at SCI-Benner Township, Wexford Health Sources, Inc., (collectively, "medical Defendants"), and Karen Holly, a registered nurse supervisor at SCI-Mahanoy. (Id. at ¶¶ 4-11).

---

[1] Plaintiff subsequently filed a document titled "amended complaint." (Doc. 30). Upon review of this filing, the document is simply a factual description of Plaintiff's previously submitted exhibits, and is fittingly labeled by Plaintiff as "exhibit facts." See (Id.). See also (Doc. 1-1).

Before the Court is a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) by Defendant Holly. (Doc. 27). Also before the Court is a motion to dismiss, or in the alternative for summary judgment, by the medical Defendants. (Doc. 31). For the reasons discussed below, the Court will grant each of the motions.

## I.    **Section 1983 Actions**

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials. *See* 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

*Id.*; *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002); *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

## II. **Motion to Dismiss**

### A. **Standard of Review**

A complaint must be dismissed under FED. R. CIV. P. 12(b)(6), if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The plaintiff must aver "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"Though a complaint 'does not need detailed factual allegations, . . . a formulaic recitation of the elements of a cause of action will not do.'" *DelRio-Mocci v. Connolly Prop. Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (citing *Twombly*, 550 U.S. at 555). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) (internal citations and quotation marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and quotation marks omitted).

*Twombly* and *Iqbal* require [a district court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not show[n] - that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citations and quotation marks omitted). This "plausibility" determination will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

However, even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

[E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

## B.    Allegations of the Complaint

The allegations of Plaintiff's complaint relate to a shoulder injury and the alleged inadequate medical treatment he received for the injury at SCI-Mahanoy and SCI-Benner

4

Township. (Doc. 1).

Plaintiff alleges that, on May 22, 2013, he was treated in sick call by Defendant Iannuzzi with complaints of pain, stiffness, and weakness in his right shoulder due to an injury he sustained while exercising a few weeks earlier. (*Id.* at ¶ 16). Plaintiff alleges that there was a fist-sized depression in the injured area. (*Id.*). Defendant Iannuzzi allegedly told Plaintiff it was a strain, and he prescribed a muscle rub and Naprosyn. (*Id.*).

Plaintiff alleges that he returned to sick call on June 12, 2013 due to increased pain in his right shoulder. (*Id.* at ¶ 17). Plaintiff requested stronger pain medication, treatment by a doctor, and that he only be handcuffed in the front because it would be less painful than being handcuffed in the back. (*Id.*). Defendant Iannuzzi allegedly denied all of these requests. (*Id.*).

Plaintiff alleges that he again went to sick call on June 27, 2013, with complaints of right shoulder pain, and was treated by Defendant Boggio. (*Id.* at ¶ 18). Plaintiff allegedly made the same requests as his previous visit, and all requests were again denied. (*Id.*). Plaintiff further alleges that Defendant Boggio acknowledged that his shoulder had atrophied. (*Id.*).

On June 29, 2013, Plaintiff returned to sick call and was treated by Defendant Boguslaw, who allegedly noticed a problem with Plaintiff's shoulder and stated that she would schedule further testing. (*Id.* at ¶ 19).

Plaintiff alleges that he was next treated on July 7, 2013 by Defendant Iannuzzi. (*Id.* at ¶ 20). Plaintiff continued to complain of pain and stiffness in his shoulder, dissatisfaction with his pain medication, and again requested to be handcuffed only in the front. (*Id.*).

On July 12, 2013, Plaintiff states that he underwent an X-ray of his shoulder which was normal with the exception of "bone demineralization." (*Id.* at ¶ 21).

Plaintiff asserts that he reviewed the X-ray results with Defendant Iannuzzi on July 22, 2013. (*Id.* at ¶ 22). Defendant Iannuzzi explained that X-ray was normal and there was no need for additional testing. (*Id.*). The following day, Plaintiff received a steroid injection, which was administered by Defendant Iannuzzi. (*Id.* at ¶ 23).

Plaintiff alleges that he was examined by Defendant Lisiak on July 27, 2013, who increased his Naprosyn dosage to 500mg twice daily. (*Id.* at ¶ 24).

Plaintiff alleges that he was next treated by Defendant Iannuzzi in July 2013 with complaints of nausea from the Naprosyn. (*Id.* at ¶ 25). Defendant Iannuzzi therefore lowered the prescribed dosage of Naprosyn. (*Id.*).

On August 5, 2013, Plaintiff was treated by Defendant Iannuzzi with continued complaints of pain. (*Id.* at ¶ 26). Defendant Iannuzzi considered referring Plaintiff for physical therapy treatment. (*Id.*).

Plaintiff alleges that, the following day, he was prescribed a liquid pain killer. (*Id.* at ¶ 27).

Plaintiff asserts that he was treated by Defendant Lisiak on August 10, 2013. (*Id.* at ¶ 28). At this visit, Defendant Lisiak recommended physical therapy and treatment with an orthopaedic surgeon. (*Id.*).

On August 17, 2013, Defendant Boguslaw examined Plaintiff and noted that the doctor recommended that Plaintiff undergo physical therapy before being treated by an orthopaedic surgeon. (*Id.* at ¶ 29).

Plaintiff states that he was then treated by Defendants Iannuzzi and Lisiak on August 19, 2013. (*Id.* at ¶ 30).

Plaintiff was thereafter treated by Defendant Boguslaw on August 25, 2013, who prescribed Trixaicin, a nerve cream, and informed Plaintiff that physical therapy had not yet been approved. (*Id.* at ¶ 31).

Plaintiff alleges that he was seen by Defendant Iannuzzi on September 1, 2013 with continued complaints of shoulder pain. (*Id.* at ¶ 32). Defendant Iannuzzi allegedly advised Plaintiff to "stop going to sick-call" because "there's absolutely nothing more that can be done by them, they're not doing any MRI, no therapy[] [has been] ordered." (*Id.*). Additionally, Plaintiff asserts that Defendant Iannuzzi would adjust Plaintiff's pain medication. (*Id.*).

Plaintiff alleges that he was transferred to SCI-Benner Township on September 2, 2013. (*Id.* at ¶ 33). He was initially treated by Defendant Dr. Dancha on September 12,

2013, for his shoulder pain. (*Id.* at ¶ 34). The following day, Plaintiff was treated by Defendant Dancha and Defendant Leahy. (*Id.* at ¶ 35). Plaintiff asserts these Defendants diagnosed muscle atrophy, swelling in the injured area, shoulder tendinitis, RC infraspinatus teres minor tear, and damage to the trapezius and levator, and recommended an MRI. (*Id.*). Defendant Leahy recommended that Plaintiff perform exercises, and that she would schedule him for a physical therapy consult. (*Id.*).

Plaintiff asserts that he underwent a physical therapy consult on October 23, 2013, and was instructed to perform exercises for his shoulder. (*Id.* at ¶ 36).

Plaintiff was next treated on November 14, 2013, by Ms. Dunkle. (*Id.* at ¶ 37). Ms. Dunkle stated that she would put Plaintiff on a doctor line in order to contact an orthopaedic specialist and increase his pain medications. (*Id.*).

Plaintiff alleges that he was then seen on the doctor line by Defendant Dancha on November 21, 2013. (*Id.* at ¶ 38). Defendant Dancha allegedly informed Plaintiff that his rotator cuff was no longer reparable and the injury was permanent. (*Id.*). Plaintiff was prescribed Trixaicin, Prednisone, and Nortriptyline. (*Id.*).

Plaintiff asserts that he was next treated by Defendant Dancha on December 9, 2013 who indicated that he would administer another injection. (*Id.* at ¶ 39). Defendant Dancha administered the injection on December 12, 2013. (*Id.*).

Two months later, on February 14, 2014, Plaintiff states that he was treated by

Defendant Leahy for a shoulder evaluation. (*Id.* at ¶ 40). Defendant Leahy allegedly informed Plaintiff that he would always have pain, the range of motion may eventually correct itself, and that surgery can no longer correct his injury. (*Id.*).

Plaintiff alleges that on April 9, 2014, he was treated by Defendant Dancha on the doctor line. (*Id.* at ¶ 41). Defendant Dancha prescribed Motrin 600mg, three times daily. (*Id.*).

Plaintiff asserts that he was next treated by Defendant Dancha on May 18, 2014. (*Id.* at ¶ 42). Defendant Dancha prescribed Baclofen and allegedly stated that Plaintiff's injury could not be repaired with surgery because it was too old. (*Id.*).

On June 1, 2014, Plaintiff asserts that he was treated by Defendant Dancha, who prescribed Prednisone, and again stated that "nothing can be done." (*Id.* at ¶ 43).

On June 17, 2014, Plaintiff complained to Defendant Leahy of continued pain in his shoulder. (*Id.* at ¶ 44). Defendant Leahy allegedly informed Plaintiff that nothing can be done for his shoulder. (*Id.*).

Plaintiff underwent an MRI of his shoulder on July 7, 2014. (*Id.* at ¶ 46).

On July 18, 2014, Defendant Dancha reviewed the MRI results and informed Plaintiff that the results revealed an unknown damage to a nerve that passed through Plaintiff's muscle. (*Id.* at ¶ 47). Defendant Dancha allegedly stated that the only treatment for this injury was therapy and pain medication. (*Id.*).

9

Plaintiff states that he treated with Defendant Leahy on July 22, 2014. (*Id.* at ¶ 48). Defendant Leahy recommended that Plaintiff continue with his stretches and pain medication. (*Id.*).

Plaintiff alleges that he underwent another physical therapy consult on August 20, 2014. (*Id.* at ¶ 50). The physical therapist observed that Plaintiff's shoulder looked better, he advised Plaintiff that the injury could take years to heal, and he instructed Plaintiff to continue the same therapy routine. (*Id.*).

### C.    Discussion

#### 1.    *Official Capacity Claim*

Defendant Holly initially argues that Plaintiff cannot recover damages against her in her official capacity as such claims are barred by the Eleventh Amendment. (Doc. 28 at 6). The Eleventh Amendment bars claims for monetary damages sought against a state official acting in his or her official capacity absent a valid abrogation by Congress or consent of the State. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (holding that "absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court"). Congress did not validly abrogate or purport to abrogate the States' sovereign immunity against damages claims under section 1983, and the Commonwealth of Pennsylvania has not waived its Eleventh Amendment immunity. *See Hafer v. Melo*, 502 U.S. 21, 25-27 (1991) (suits against state officials acting in their official

capacities are suits against the employing government agency, and as such, are barred by the Eleventh Amendment); 42 Pa.C.S.A. § 8521-22. Thus, Plaintiff cannot recover monetary damages against Defendant Holly in her official capacity, as such claims are barred by the Eleventh Amendment.

### 2. Request for Specific Amount of Monetary Damages

Defendant Holly next argues that Plaintiff's request for a specific amount of monetary damages must be dismissed. (Doc. 28 at 7). Plaintiff's claims for specified amounts of unliquidated damages violates Local Rule 8.1. See M.D. Pa. L.R. 8.1 (stating, "...the party claiming damages is entitled to monetary relief but shall not claim any specific sum where unliquidated damages are involved"). Accordingly, Plaintiff's demand for a specific amount of monetary damages will be dismissed.

### 3. Request for Declaratory Relief against Defendant Holly

The Court next concludes that Plaintiff's request for declaratory relief against Defendant Holly is moot because he is no longer confined at SCI-Mahanoy, nor is there any likelihood of his return. See Johnson v. Wenerowicz, 440 Fed. App'x 60, 62 (3d Cir. 2011) (holding that the prisoner's "requests for injunctive and declaratory relief against the named DOC defendants were rendered moot by his transfer" to another prison); Fortes v. Harding, 19 F. Supp. 2d 323, 326 (M.D. Pa. 1998) (concluding that unless there is a reasonable likelihood that the prisoner will be returned to the prison against which he seeks injunctive or

11

declaratory relief, the prisoner's "transfer to another institution moots any claims for

injunctive or declaratory relief"). Therefore, Plaintiff's request for declaratory relief against

Defendant Holly will be dismissed as moot.

### 4. Personal Involvement

Defendant Holly next argues that Plaintiff fails to state a claim against her because

she lacks personal involvement in the alleged wrongs, and liability cannot be based solely

on the doctrine of *respondeat superior*. (Doc. 28 at 8-9). The Court agrees.

Regarding *respondeat superior* liability, it is well-established that:

> A defendant in a civil rights action must have personal involvement in the
> alleged wrongs. . . . [P]ersonal involvement can be shown through allegations
> of personal direction or of actual knowledge and acquiescence. Allegations of
> participation or actual knowledge and acquiescence, however, must be made
> with appropriate particularity.

*Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

A review of the complaint confirms that there are no specific assertions that

Defendant Holly had any personal involvement in the purported violations of Plaintiff's

constitutional rights. *See* (Doc. 1). Plaintiff does not allege that Defendant Holly was aware

of or acquiesced in the purported constitutional violations by the prison medical staff.

Notably, Defendant Holly is only listed as a Defendant to this action, and the complaint

Plaintiff fails to set forth any allegations against Defendant Holly. *See* (Doc. 1).

Accordingly, Plaintiff's claims against Defendant Holly will be dismissed for lack of personal

involvement.

To the extent that Plaintiff attempts to hold Defendant Holly liable based on her role as nurse supervisor, this ground of *respondeat superior* liability has been squarely rejected by the courts. *See Rode*, 845 F.2d at 1207. Accordingly, any claims against Defendant Holly based on a *respondeat superior* theory of liability will likewise be dismissed.

To the extent that Plaintiff attempts to hold Defendant Holly liable based on her involvement in the grievance procedure and responses to inmate grievances, this claim must also be dismissed. Plaintiff submitted exhibits wherein Defendant Holly reviewed and responded to grievances, and responded to inmate requests to staff. (Doc. 1-1 at 3, 8, 13-14, 23, 30). Dissatisfaction with responses to an inmate's grievances does not support a constitutional claim. *See Alexander v. Gennarini*, 144 Fed. App'x 924 (3d Cir. 2005) (concluding that involvement in the post-incident grievance process is not a basis for § 1983 liability). The "failure of a prison official to provide a favorable response to an inmate grievance is not a federal constitutional violation." *Flanagan v. Shively*, 783 F. Supp. 922, 931-32 (M.D. Pa. 1992), *aff'd*, 980 F.2d 722 (3d Cir. 1992). Thus, to the extent that Defendant Holly is sued in her capacity for reviewing and responding to Plaintiff's grievances and requests to staff, dissatisfaction with responses to an inmate's grievances does not support a constitutional claim. *See Alexander*, 144 Fed. App'x 924; *Cole v. Sobina*, No, 04-99J, 2007 WL 4460617, at *5 (W.D. Pa. 2007) ("[M]ere concurrence in a

prison administrative appeal process does not implicate a constitutional concern.").

Accordingly, Plaintiff's claims against Defendant Holly, based on her participation in the

grievance procedure and inmate requests to staff, will be dismissed.

### 5. Deliberate Indifference to Medical Needs

The Eighth Amendment's proscription against cruel and unusual punishment

requires that prison officials provide inmates with adequate medical care. *See Estelle v.*

*Gamble*, 429 U.S. 97, 103-05 (1976). In order to establish an Eighth Amendment medical

claim, a plaintiff "must show (i) a serious medical need, and (ii) acts or omissions by prison

officials that indicate deliberate indifference to that need." *Natale v. Camden Cty. Corr.*

*Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (citing *Rouse v. Plantier*, 182 F.3d 192, 197 (3d

Cir. 1999)). A serious medical need is "one that has been diagnosed by a physician as

requiring treatment or one that is so obvious that a lay person would recognize the

necessity for a doctor's attention." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*,

834 F.2d 326, 347 (3d Cir. 1987). In addition, "if unnecessary and wanton infliction of pain

results as a consequence of denial or delay in the provision of adequate medical care, the

medical need is of the serious nature contemplated by the eighth amendment." *Id.* (citation

omitted).

A prison official acts with deliberate indifference to an inmate's serious medical

needs when he "knows of and disregards an excessive risk to inmate health or safety; the

official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment. *See Farmer v. Carlson*, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988); *see also McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977); *Smart v. Villar*, 547 F.2d 112, 113 (10th Cir. 1976), *cert. denied*, 450 U.S. 1041 (1981).

For purposes of this Memorandum only, Defendant Holly concedes that Plaintiff has a serious medical need. (Doc. 28 at 10). Thus, the Court must determine whether Plaintiff has pled a deliberate indifference to that need.

In the complaint, Plaintiff fails to set forth any allegations against Defendant Holly. *See* (Doc. 1). Other than being listed as a Defendant, there are no further references to Defendant Holly in the complaint. Plaintiff does not allege that Defendant Holly treated him or failed to treat him. As aptly explained by Defendant Holly, a registered nurse is precluded from making medical diagnoses and prescribing medical corrective measures. (Doc. 28 at 11) (citing 63 P.S. § 212; *Corrigan v. Methodist Hospital*, 107 Fed. App'x 269 (3d Cir. 2004); *Earls v. Sexton*, 2010 U.S. Dist. LEXIS 52980 (M.D. Pa. 2010)).

Plaintiff submitted Defendant Holly's August 28, 2013 response to his inmate

15

grievance, wherein she ultimately concluded that Plaintiff was receiving adequate medical care from the prison medical staff. (Doc. 1, Ex. 2: 2-3 of 10). In the grievance response, Defendant Holly specifically noted that Plaintiff was physically examined twice in July 2013, the exams showed good range of motion, he received a steroid injection, an X-ray (which was negative), and is prescribed Naprosyn, Nortriptyline, Tylenol, muscle rub, and Pepcid. (*Id.*). Plaintiff simply fails to state that Defendant Holly exhibited any deliberate indifference to his serious medical needs, and fails to state a cognizable claim against Defendant Holly. Thus, the claims against Defendant Holly will be dismissed.

### 6. *State Law Claim*

Plaintiff's state law claim against Defendant Holly will also be dismissed. A district court may decline to exercise supplemental jurisdiction over a state law claim or claims if the district court dismisses those claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c)(3). Since the claims that form the basis of this Court's jurisdiction under 28 U.S.C. § 1331 will be dismissed, the Court declines to exercise supplemental jurisdiction.

## III. Motion for Summary Judgment

### A. Standard of Review

The medical Defendants have framed their motion as one seeking dismissal under Rule 12(b) of the Federal Rules of Civil Procedure or, in the alternative, for summary judgment pursuant to Rule 56. (Doc. 31). When a party moves to dismiss, but where

16

"matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d). Typically, when a court converts a motion to dismiss into a motion for summary judgment under Rule 56, notice must be given to all parties of the court's intent to do so. *Id.*; *Garcia v. Newtown Twp.*, 2010 WL 785808, at *3 (E.D. Pa. 2010). However, if a motion to dismiss has been filed with an alternative request for summary judgment, the Third Circuit Court of Appeals has found that the alternative filing is sufficient to "place the parties on notice that summary judgment might be entered." *Latham v. United States*, 306 Fed. App'x 716, 718 (3d Cir. 2009) (citing *Hilfirty v. Shipman*, 91 F.3d 573, 578-79 (3d Cir. 1996)). Accordingly, the Court will treat the medical Defendants' motion as one for summary judgment.

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a

17

genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

Therefore, the non-moving party may not oppose summary judgment simply on the basis of

the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S.

at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by citing to particular parts of materials in the record . . . or showing that the

materials cited do not establish the absence or presence of a genuine dispute, or that an

adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P.

56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court

need consider only the cited materials, but it may consider other materials in the record."

FED. R. CIV. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the

non-moving party, and where the non-moving party's evidence contradicts the movant's,

then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am.,*

*Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127

S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the

summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts. Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial. The mere existence of some alleged factual dispute between

the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## B.  Statement of Undisputed Facts

Rule 56 of the Federal Rules of Civil Procedure provides: "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion." FED. R. CIV. P. 56(e)(2). Similarly, Middle District of Pennsylvania Local Rule 56.1 states: "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." M.D. Pa. L.R. 56.1. Plaintiff filed a "statement of disputed factual issues" wherein he poses several rhetorical questions as to the adequacy of the medical Defendants' treatment. (Doc. 41-1). This document fails to set forth a responsive statement of facts as required by the Federal Rule of Civil Procedure 56(e)(2) and Local Rule 56.1. Thus, the undisputed facts, taken from Defendants' statement of material facts, (Doc. 32), and exhibits submitted therewith, are as follows.

Plaintiff asserts that he was first treated for his shoulder injury at SCI-Mahanoy on May 22, 2013, by Defendant Iannuzzi. (Doc. 1, ¶ 16). Plaintiff was again treated by

19

Defendant Iannuzzi June 12, 2013, alleging increased pain in his right shoulder. (*Id.* at ¶ 17). Plaintiff requested stronger pain medication, treatment by a doctor, and that he only be handcuffed in the front because it would be less painful than being handcuffed in the back. (*Id.*). Defendant Iannuzzi allegedly denied all of these requests. (*Id.*). However, in Defendant Iannuzzi's June 12, 2013 progress note, there is no evidence that Plaintiff made any of these requests, and even if he had, Defendant Iannuzzi asserts that he has no authority to grant these requests. (Doc. 32-2, Ex. A-120). The progress note reveals that Plaintiff reported that his shoulder hurt less than it did the previous month, and he only had "some pain" when he extended his shoulder beyond 90 degrees. (*Id.*).

On June 28, 2013, Plaintiff was treated by Defendant Boggio, who allegedly acknowledged that Plaintiff's shoulder blade had "atrophied or shriveled up." (Doc. 1, ¶ 18). Plaintiff alleges that he again requested stronger pain medication and to be handcuffed in the front of his body, and all requests were again denied. (*Id.*). However, the progress note dated June 28, 2013 does not indicate that any of these requests were made. (Doc. 32-2, Ex. A.-120). Plaintiff also reported to Defendant Boggio that he was "much better" and able to move around. (*Id.*).

The next day, June 29, 2013, Plaintiff was treated by Defendant Boguslaw, who allegedly noticed a problem with Plaintiff's shoulder and stated that she would schedule further testing. (Doc. 1, ¶ 19). In the progress note, Defendant Boguslaw indicated that she

20

examined Plaintiff through his cell door, and his right shoulder "appears as though it <u>may</u> have a deformity." (Doc. 32-2, Ex. A-121). She therefore ordered that Plaintiff be treated in triage for further evaluation and palpation. (*Id.*).

On July 7, 2013, Plaintiff was treated by Defendant Iannuzzi. (Doc. 1, ¶ 20). Plaintiff continued to complain of pain and stiffness, dissatisfaction with his pain medication, and he again requested to be handcuffed only in the front. (*Id.*). Again, the progress note dated July 7, 2013, fails to recognize any conversation regarding Plaintiff's request to be handcuffed in the front of his body. (Doc. 32-2, Ex. A-121). Defendant Iannuzzi noted that Plaintiff had full range of motion to his shoulder, and no obvious deformity. (*Id.*). He ordered an X-ray, further evaluation in triage to determine if an injection was necessary, and placed Plaintiff on a medical lay-in. (Doc. 32-2, Ex. A-77, 121).

An X-ray was performed on July 12, 2012, which was normal with the exception of "bone demineralization." (Doc. 1, ¶ 21; Doc. 32-2, Ex. A-67, 121).

Plaintiff reviewed the X-ray results with Defendant Iannuzzi on July 22, 2013. (Doc. 1, ¶ 22). Defendant Iannuzzi noted that Plaintiff was scheduled for triage and possible steroid injection. (Doc. 32-2, Ex. A-118). The following day, July 23, 2013, Defendant Iannuzzi administered a steroid injection. (Doc. 1, ¶ 23; Doc. 32-2, Ex. A-17, 118). Upon examination, he noted that Plaintiff had full range of motion to his shoulder and no pain unless he extended his shoulder beyond 90 degrees. (Doc. 32-2, Ex. A-118). Defendant

21

Iannuzzi diagnosed degenerative joint disease, tendinitis, osteoarthritis, and possible supraspinatus. (*Id.*).

Plaintiff was next treated on July 27, 2013 by Defendant Lisiak. (Doc. 1, ¶ 24). Defendant Lisiak examined Plaintiff through his cell door and noted that there was atrophy on the right side. (Doc. 32-2, Ex. A-119). He diagnosed posterior shoulder discomfort and increased Plaintiff's Naprosyn dose to 500mg twice daily. (*Id.*).

Two days later, Plaintiff was treated by Defendant Iannuzzi. (Doc. 1, ¶ 25; Doc. 32-2, Ex. A-119). Plaintiff reported that the steroid injection improved his range of motion but he continued to have pain in his right shoulder. (Doc. 32-2, Ex. A-119). Plaintiff further complained that the Naprosyn upset his stomach. (*Id.*). Defendant Iannuzzi therefore decreased the dosage of Naprosyn, and prescribed Pepcid and Tylenol. (*Id.*).

Plaintiff returned to sick call on August 5, 2013 and was treated by Defendant Iannuzzi. (Doc. 1, ¶ 26; Doc. 32-2, Ex. A-116). Plaintiff again alleges that his request to be handcuffed in the front was denied. (*Id.*). Defendant Iannuzzi noted that Plaintiff had full range of motion to his shoulder, he considered referring Plaintiff to physical therapy, instructed Plaintiff to perform stretching exercises, and prescribed Nortriptyline. (*Id.*).

On August 17, 2013, Defendant Boguslaw examined Plaintiff and noted that he recently underwent a steroid injection and recently had his pain medications increased. (Doc. 1, ¶ 29; Doc. 32-2, Ex. A-117). Plaintiff reported that his strength was ok, but he

struggled with endurance, i.e., he "can lift [his] arm but can't hold it up for periods of time." (Doc. 32-2, Ex. A-117). Upon examination, Defendant Boguslaw noted that Plaintiff had a muscular deformity in his shoulder, though he also exhibited full range of motion. (*Id.*). Defendant Boguslaw diagnosed atrophy, ruled out nerve impingement/damage, and considered an MRI if the atrophy did not improve. (*Id.*).

On August 19, 2013, Plaintiff was treated by Defendant Iannuzzi and he requested stronger pain medication. (Doc. 1, ¶ 30; Doc. 32-2, Ex. A-110). Upon examination, Defendant Iannuzzi noted that Plaintiff could move his shoulder to 160 degrees before he felt pain. (*Id.*). Defendant Iannuzzi diagnosed degenerative joint disease, osteoarthritis, and a sprain, and continued Plaintiff on Nortriptyline. (*Id.*).

Plaintiff was then treated by Defendant Boguslaw on August 25, 2013, who allegedly informed Plaintiff that physical therapy had not been approved due to transportation problems in the restricted housing unit ("RHU"). (Doc. 1, ¶ 31). Defendant Boguslaw noted a deformity in Plaintiff's right shoulder, and prescribed a topical nerve cream. (Doc. 32-2, Ex. A-112, 143).

Plaintiff was treated by Defendant Iannuzzi on September 1, 2013. (Doc. 1, ¶ 32). Defendant Iannuzzi allegedly advised Plaintiff to "stop going to sick-call." (*Id.*). Upon examination, Defendant Iannuzzi noted symmetrical range of motion bilaterally, and he increased Plaintiff's pain medication. (Doc. 32-2, Ex. A-108, 142).

The following day, September 2, 2013, Plaintiff was transferred to SCI-Benner Township. (Doc. 1, ¶ 33). While at SCI-Benner Township, Plaintiff was treated by Defendants Dancha and Leahy.

On September 12, 2013, Defendant Dancha treated Plaintiff for his shoulder pain and noted a concave defect in his shoulder. (Doc. 1, ¶ 34; Doc. 32-2, Ex. A-107). Defendant Dancha noted, "[a]t this point, treatment is symptomatic only", and further noted that he would review the case with an orthopaedic physician's assistant. (Doc. 32-2, Ex. A-107).

Plaintiff was treated the following day by Defendant Leahy. (Doc. 1, ¶ 35; Doc. 32-2, Ex. A-104). Upon examination, Defendant Leahy observed muscle atrophy, which created a shallow depression. (Doc. 32-2, Ex. A-104). She diagnosed right shoulder tendinitis and a tear. (Id.). Defendant Leahy recommended that Plaintiff perform exercises, and stated that she would schedule Plaintiff for a physical therapy consult and would consider an MRI. (Id.). Defendant Leahy prescribed hot and cold therapy, Naprosyn, and a muscle rub. (Id.).

On September 24, 2013, Plaintiff was informed by Ms. Dunkle that he was approved for physical therapy and she believed this would be most effective for treating his pain. (Doc. 32-2, Ex. A-105). Plaintiff began physical therapy on October 23, 2013 and was instructed to perform exercises for his shoulder. (Doc. 1, ¶ 36; Doc. 32-2, Ex. A-66, 105).

On November 14, 2013, Plaintiff was again treated by Ms. Dunkle. (Doc. 1, ¶ 37;

Doc. 32-2, Ex. A-102). Plaintiff complained of increased pain in his right shoulder despite doing physical therapy and receiving a steroid injection. (Doc. 32-2, Ex. A-102). Ms. Dunkle placed Plaintiff on the doctor line in order to contact an orthopaedic specialist and increase his pain medications. (Id.).

On November 21, 2013, Plaintiff was seen on the doctor line by Defendant Dancha. (Doc. 1, ¶ 38; Doc. 32-2, Ex. A-102). Plaintiff complained of right shoulder discomfort and stated that he felt better on Nortriptyline. (Doc. 1, Ex. A-102). Defendant Dancha informed Plaintiff that his torn rotator cuff was not reparable because it had been more than six (6) months since the injury. (Id.). Upon examination, Defendant Dancha noted that Plaintiff had full range of motion to the right shoulder. (Id.). Defendant Dancha prescribed Trixaicin, Prednisone, and Nortriptyline. (Id.).

Plaintiff next treated with Defendant Dancha on December 9, 2013. (Doc. 1, ¶ 39; Doc. 32-2, Ex. A-103). Plaintiff reported that his current medications helped with the pain and he was working on his physical therapy exercises. (Doc. 32-2, Ex. A-103). An examination revealed a large scapular defect, and decreased strength. (Id.). Defendant Dancha recommended continued physical therapy and a steroid injection. (Id.). Defendant Dancha administered a steroid injection on December 12, 2013. (Doc. 1, ¶ 39; Doc. 32-2, Ex. A-74, 103, 141).

On February 10, 2014, Ms. Dunkle treated Plaintiff for continued complaints of pain

in his right shoulder. (Doc. 32-2, Ex. A-103). Ms. Dunkle advised Plaintiff that he would be re-examined when he returned to general population. (*Id.*).

On February 14, 2014, Plaintiff was treated by Defendant Leahy for a shoulder evaluation. (Doc. 1, ¶ 40). Defendant Leahy allegedly informed Plaintiff that he would always have pain, the range of motion may eventually correct itself, and that surgery can no longer correct his injury. (*Id.*). Defendant Leahy's progress note does not reflect this conversation. (Doc. 32-2, Ex. A-100). Defendant Leahy noted that Plaintiff had full range of motion, though he also had muscle atrophy. (*Id.*).

On March 17, 2014, Plaintiff was seen by Ms. Dunkle with continued complaints of right shoulder pain, especially at night. (Doc. 32-2, Ex. A-100). Ms. Dunkle advised Plaintiff that he is likely to experience some discomfort regardless of what pain medications were prescribed. (Doc. 32-2, Ex. A-100, 101). Ms. Dunkle requested a physician chart review so that his medications could be reviewed. (*Id.*). Defendant Dancha performed the chart review two (2) days later and recommended another steroid injection, an increase of Nortriptyline, or a switch to Elavil, and add Tegratol. (Doc. 32-2, Ex. A-101).

On March 25, 2014, Defendant Dancha noted that Plaintiff was a "no show for MD line", and therefore not examined. (*Id.*).

On April 9, 2014, Plaintiff was examined by Defendant Dancha. (Doc. 1, ¶ 41; Doc. 32-2, Ex. A-98). Plaintiff reported that he was "still doing conventional pushups." (Doc. 32-

2, Ex. A-98). Defendant Dancha observed that the defect in Plaintiff's right shoulder was somewhat less due to exercise, and prescribed Motrin 600mg. (*Id.*).

Plaintiff next treated with Defendant Dancha on May 18, 2014. (Doc. 1, ¶ 42; Doc. 32-2, Ex. A-98). Defendant Dancha allegedly stated that Plaintiff's injury could not be repaired with surgery because it was too old, however this conversation is not reflected in the progress notes. (*Id.*). Plaintiff reported that Nortriptyline was helping ease his discomfort, and he continued to perform exercises, though they irritated his rotator cuff. (*Id.*). Defendant Dancha advised Plaintiff that he "must lay off push ups", and he prescribed Baclofen. (*Id.*).

On June 1, 2014, Plaintiff was again treated by Defendant Dancha. (Doc. 1, ¶ 43; Doc. 32-2, Ex. A-99). Plaintiff alleges that Defendant Dancha stated that nothing further could be done for him, however this is not reflected in the progress notes. (*Id.*). Plaintiff reported that he felt better with his current medications, and he requested Prednisone, stating that it provided him the best relief. (*Id.*). Defendant Dancha complied with his request and prescribed Prednisone. (*Id.*).

On June 17, 2014, Plaintiff complained to Defendant Leahy of continued pain in his shoulder. (Doc. 1, ¶ 44). Defendant Leahy ordered an orthopaedic surgeon consultation and an MRI. (Doc. 32-2, Ex. A-71, 99). On that same day, Defendant Dancha ordered an orthopaedic consultation. (Doc. 32-2, Ex. A-60). Defendant Dancha noted that Plaintiff

27

injured his shoulder in April 2013 while doing inverted pushups in his cell. (Id.). He further

noted that Plaintiff reported that physical therapy was not helping. (Id.). Defendant Dancha

noted that Plaintiff's treatment included a physical therapy consult in October 2013,

numerous medications, and steroid injections. (Id.).

Plaintiff underwent an MRI of his shoulder on July 7, 2014. (Doc. 1, ¶ 46; Doc. 32-2,

Ex. A-62). The findings revealed that "[t]he rotator cuff is intact, with no evidence of

tendinosis or tear." (Id.). The overall impression was "mild acromioclavicular spurring with

indentation of the supraspinatus tendon. Otherwise, unremarkable study." (Id.).

Defendant Dancha was not convinced that the findings were clinically insignificant

and therefore requested that a radiologist re-read the MRI. (Id.). On July 14, 2014, a

radiologist reviewed the MRI and noted that there was a small rotator tear, chronic

anterior/superior labral tear with deformation of the labrum and a paralabral cyst, and

moderately severe, chronic atrophy of the supraspinatus muscle. (Doc. 32-2, Ex. A-63).

On July 18, 2014, Defendant Dancha reviewed the MRI results and informed Plaintiff

that the results revealed an unknown damage to a nerve that passed through Plaintiff's

muscle. (Doc. 1, ¶ 47; Doc. 32-2, Ex. A-96). Defendant Dancha explained that the only

treatment was physical therapy and pain medication. (Id.).

Plaintiff treated with Defendant Leahy on July 22, 2014. (Doc. 1, ¶ 48). Defendant

Leahy allegedly stated that she did not believe the MRI showed nerve damage, and the only

treatment that could help Plaintiff was stretching and pain medication. (*Id.*).

Plaintiff began physical therapy on August 20, 2014. (Doc. 1, ¶ 50; Doc. 32-2, Ex. A-58). The physical therapist noted that the muscle was wasting away over the distal lateral region, but it was improved since October 23, 2013. (*Id.*). Plaintiff was instructed to continue strength and range of motion exercises, and was advised not to do any pushups. (*Id.*).

On October 19, 2014, Plaintiff was seen by Defendant Dancha. (Doc. 32-2, Ex. A-97). Plaintiff continued to complain of pain, and stated that physical therapy and medications were not effective. (*Id.*). Defendant Dancha requested a consultation with an orthopaedic surgeon to determine if Plaintiff's injury could be corrected. (Doc. 32-2, Ex. A-57, 97). On October 27, 2014, Plaintiff was examined by an orthopaedic surgeon who noted that Plaintiff had full range of motion to the shoulder, and recommended an EMG/nerve conduction study. (Doc. 32-2, Ex. A-57).

On November 10, 2014, Defendant Leahy treated Plaintiff and issued a consultation with physical therapy. (Doc. 32-2, Ex. A-56).

On November 21, 2014, Defendant Leahy advised Plaintiff that the EMG was ordered. (Doc. 32-2, Ex. A-95). Plaintiff inquired whether he could receive another injection, however Defendant Leahy advised that she would not order another injection until they received the results of the EMG. (*Id.*). Defendant Leahy also noted that Plaintiff

requested to be handcuffed in the front, however the physical therapist and orthopaedic surgeon revealed no medical need to avoid handcuffing in the back. (*Id.*).

On December 18, 2014, Plaintiff underwent physical therapy and it was noted that his range of motion to the shoulder was within functional limits, with decreased strength with abduction. (Doc. 32-2, Ex. A-56).

On January 7, 2015, Plaintiff underwent an EMG with nerve study. (Doc. 32-2, Ex. A-2, 52). The study revealed "a significant, active right suprascapular neuropathy, especially involving the branch to the infraspinatus muscle ... no evidence for right cervical radiculopathy [and] ... very mild (borderline) carpal tunnel syndrome." (*Id.*).

## C.    Discussion

### 1.    *Deliberate Indifference to Medical Needs*

As stated *supra*, the Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." *Rouse*, 182 F.3d at 197. In the context of medical care, the relevant inquiry is whether the defendant was deliberately indifferent to the plaintiff's serious medical needs. *See Monmouth Cty.*, 834 F.2d at 346.

The evidence of record clearly demonstrates that Plaintiff received medical attention while incarcerated at SCI-Mahanoy and SCI-Benner Township, and the attention he received lacks the requisite deliberate indifference to support a § 1983 claim. Plaintiff fails to present evidence demonstrating that there is genuine issue of fact regarding the

30

adequacy of medical care rendered to him. To the contrary, Plaintiff acknowledges that he did receive extensive medical care at SCI-Mahanoy and SCI-Benner Township, as highlighted above. Plaintiff's claims amount to nothing more than his subjective disagreement with that medical care.

With respect to Plaintiff's claim that the medical Defendants failed to properly treat his shoulder injury, the evidence reveals that their actions do not amount to deliberate indifference to Plaintiff's serious medical needs. Subsequent to Plaintiff's injury, he went to sick call several times and was treated by medical personnel on numerous occasions. Based on examinations and evaluations, the medical Defendants created appropriate treatment plans for Plaintiff's shoulder pain and injury. At SCI-Mahanoy, Plaintiff was prescribed various anti-inflammatories and pain medications (Naprosyn, Tylenol, Nortriptyline, and Zostrix), he underwent an X-ray, received a steroid injection, and a physical therapy consult was ordered. While incarcerated at SCI-Benner Township, Plaintiff was prescribed anti-inflammatories, pain medications, and steroids (Naprosyn, Zostrix, Nortriptyline, Prednisone, Motrin, and Baclofen), he received steroid injections, consulted with an orthopaedic surgeon and orthopaedic physician's assistant, underwent physical therapy, and underwent an MRI and EMG/nerve conduction study. The medical Defendants presumably ordered these various tests, prescribed medications, and referred Plaintiff to physical therapy and a specialist in an attempt to properly diagnose and treat

31

him.

Plaintiff "concedes the fact that SCI-Mahanoy did give him several different pain medications and one steroid injection and an X-ray." (Doc. 41 at 5). However, Plaintiff proceeds to express dissatisfaction and disagreement with the medical Defendants' course of treatment. (*Id.* at 5-12). As to Plaintiff's allegation that the medical Defendants failed to render proper medical treatment, the Court will not second guess the decision of medical professionals. *See Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (courts will "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment ... (which) remains a question of sound professional judgment."). Moreover, Plaintiff's claim that there was a delay in receiving an MRI and physical therapy fails to establish deliberate indifference. (Doc. 41 at 10). *See, e.g.*, Wood *v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990) (a two month delay before surgically removing broken pins in the prisoner's shoulder was not deliberate indifference because the prisoner had already received some treatment and the delay did not cause substantial harm). The undisputed evidence of record reveals that Plaintiff was adequately treated for his shoulder pain and injury, and received continuous, extensive medical treatment for his symptoms. Although Plaintiff may not be wholly satisfied with the treatment he received at SCI-Mahanoy and SCI-Benner Township, the medical Defendants' actions do not amount to deliberate indifference to a serious medical need. *See, e.g., Gindraw v. Dendler*, 967 F.

32

Supp. 833, 836 (E.D. Pa. 1997) ("[T]he exercise by a doctor of his professional judgment is never deliberate indifference."). *See also Tenon v. Dreibelbis*, 606 Fed. App'x 981, 686 (3d Cir. 2015) ("a dispute over the adequacy of the treatment or the need to pursue one course of treatment over another ... generally fails to state a claim for relief under the Eighth Amendment") (citing *United States v. Fayette County*, 599 F.2d 573, 575 n. 2 (3d Cir. 1979) (per curiam) ("When a prisoner had received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."))

To the extent that Plaintiff is dissatisfied with the type and dosage of medication prescribed to him, this claim likewise fails to establish deliberate indifference. The evidence of record, as well as Plaintiff's allegations, do not demonstrate that he was denied medication. The evidence reveals that Plaintiff was prescribed several medications to treat his injury, *to wit*, Naprosyn, Tylenol, Nortriptyline, Zostrix, Prednisone, Motrin, and Baclofen. The medical Defendants clearly did not refuse to provide Plaintiff with medication. Plaintiff's disagreement with the type and dosage of medication provided to him does not give rise to a constitutional violation. *See, e.g., Gause v. Diguglielmo*, 339 Fed. App'x 132, 136 (3d Cir. 2009) (a dispute over the choice of medication does not rise to the level of an Eighth Amendment violation); *Rush v. Fischer*, No. 09-9918, 2011 WL 6747392, at *3 (S.D.N.Y. 2011) ("The decision to prescribe one form of pain medication in place of another does not

constitute deliberate indifference to a prisoner's serious medical needs.").

Regarding Plaintiff's request to be front cuffed, the records reflect that the physical therapist and orthopaedic surgeon determined that there was no medical need to avoid handcuffing in the back. (Doc. 32-2, Ex. A-95). Although Plaintiff alleges that he suffered discomfort from handcuffing in the back, the medical records fail to establish that he had a serious medical need requiring that he be cuffed in front. Several medical notes indicate that Plaintiff had full range of motion to the shoulder, he was exercising, and doing conventional pushups. (Doc. 32-2, Ex. A-57, 58, 98, 100, 102, 116-118, 121).

By Plaintiff's own account, he was provided medication, physical therapy, and underwent various tests for his shoulder. While Plaintiff may disagree with the treatment provided by the medical Defendants, their treatment of him does not demonstrate deliberate indifference or unnecessary and wanton infliction of pain and does not amount to a constitutional violation. This is particularly true in light of the fact that there is no indication that the medical Defendants intentionally withheld medical treatment from Plaintiff in order to inflict pain or harm upon him. Plaintiff's subjective disagreement with the treatment decisions and medical judgment of the medical Defendants does not establish deliberate indifference. *See Carpenter v. Kloptoski*, No. 08-2233, 2012 WL 983565, at *6 (M.D. Pa. 2012) (citing *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990)) (observing that "a prisoner's subjective dissatisfaction with his medical care does not in itself indicate

deliberate indifference"). Claims of medical malpractice and disagreements as to the proper course of medical treatment simply do not suffice to satisfy the deliberate indifference standard. *See Monmouth Cty.*, 834 F.2d at 346. Courts will not second guess whether a particular course of treatment is adequate or proper. *See Parham v. Johnson*, 126 F.3d 454, 458 n.7 (3d Cir. 1997) (quoting *Inmates of Allegheny Cty. Jail*, 612 F.2d at 762).

To the extent that Plaintiff believes his medical records were somehow falsified, he offers no evidence in support of this claim. *See* (Doc. 41 at 2). Plaintiff offers no proof that any Defendant falsified the medical records, nor does he offer any proof that the medical records have in fact been falsified. Assuming *arguendo* that Plaintiff's medical records have somehow been falsified, this nevertheless does not establish that any of the medical Defendants exhibited deliberate indifference to his serious medical needs.

A party opposing summary judgment must come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. *Pappas v. City of Lebanon*, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. *See Anderson*, 477 U.S. at 250-57; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-89 (1986); *see also* FED. R. CIV. P. 56(c), (e). Plaintiff has failed to meet his burden with respect to the claim that he received inadequate medical care at SCI-Mahanoy and SCI-Benner Township. Plaintiff submitted portions of his

medical records, however they are the same records as those submitted by the medical Defendants, and they fail to demonstrate that there is genuine issue of fact as to the adequacy of treatment. *See* (Docs. 32-1, 32-2, 40). The medical Defendants are therefore entitled to an entry of summary judgment.

### 2. State Law Claim

Plaintiff's state law claim against the medical Defendants will be dismissed. As previously stated, a district court may decline to exercise supplemental jurisdiction over a state law claim or claims if the district court dismisses those claims over which it has original jurisdiction. The Court declines to exercise supplemental jurisdiction over the claims remaining in this case. *See* 28 U.S.C. § 1367(c).

## IV. Conclusion

For the reasons set forth above, the motion to dismiss by Defendant Holly will be granted. (Doc. 27). The medical Defendants' motion for summary judgment will be granted. (Doc. 31).

An appropriate Order shall issue.[2]

Date: September 25, 2015

Robert D. Mariani
United States District Judge

---

[2]     When a complaint fails to present a prima facie case of liability, courts should generally grant leave to amend before dismissing a complaint. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *Shane v. Fauver*, 213 F.3d 113, 116-17 (3d Cir. 2000). Specifically, the Third Circuit has admonished that when a complaint is subject to dismissal for failure to state a claim, courts should liberally grant leave to amend "unless such an amendment would be inequitable or futile." *Phillips*, 515 F.3d at 245 (citing *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004)). The federal rules allow for liberal amendments in light of the "principle that the purpose of pleading is to facilitate a proper decision on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962) (citations and internal quotations omitted). In the matter *sub judice*, the flaws in Plaintiff's claims are both legal and factual and thus incurable. Therefore, the Court concludes that curative amendment would be futile.